SYLVIA DEVELOPMENT CORPORATION; Karel Dohnal, individually and as Agent for Sylvia Development Corporation, Plaintiffs–Appellants,

v.

CALVERT COUNTY, MARYLAND; Michael J. Moore; Hagner R. Mister; Patrick M. Buehler; Mary M. Krug, all of the above are Board of County Commissioners of Calvert County in their official capacities; Joyce Lyons Terhes, in her official capacity as current and former Member of Board, and individually; William T. Bowen, individually and in his official capacity as former Member of Board of County Commissioners of Calvert County; Barbara A. Stinnett, individually and in her official capacity as former Member of Board of County Commissioners of Calvert County, Defendants–Appellees.

No. 94–1181.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 3, 1994.

Decided March 3, 1995.

814

**ARGUED:** Tracy E. Mulligan, Jr., Rockville, MD, for appellants. Charles B. Keenan, Jr., Stark & Keenan, P.A., Bel Air, MD, for appellees.

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge MURNAGHAN and Judge MOTZ joined.

## OPINION

NIEMEYER, Circuit Judge:

The Calvert County (Maryland) Board of Commissioners, by a vote of three to two, denied Sylvia Development Corporation a special zoning designation to develop agricultural land in Calvert County into a subdivision of single-family homes. Although the County Board's decision was reversed by the Circuit Court for Calvert County and the special zoning rights were later approved (again by a three to two vote), Sylvia Development lost its economic opportunity because of the 11–month delay. Sylvia Development and its president and principal stockholder, Karel Dohnal, sued the County and the members of its Board of Commissioners, under 42 U.S.C. §§ 1983 and 1985(3), alleging (1) that the Board arbitrarily denied Sylvia Development's application because Dohnal was born in Czechoslovakia, or because he and his company were out-of-county developers, in violation of the Equal Protection Clause of the Fourteenth Amendment; (2) that the commissioners conspired to deny Dohnal and Sylvia Development their equal protection rights; and (3) that the Board's decision arbitrarily deprived Sylvia Development of a property interest in the special zoning designation in violation of the Due Process Clause of the Fourteenth Amendment. The district court entered summary judgment in favor of the defendants and, for the reasons that follow, we affirm.

I

In March 1989, Karel Dohnal, president, CEO, and principal stockholder of Sylvia Development Corporation, signed a conditional contract on behalf of Sylvia Development to purchase a 97.2 acre tract of rural land along Hance Road in Calvert County, Maryland. Dohnal intended to develop the tract into a subdivision of single-family homes called "Blue Dolphin Estates." The land contract was conditioned on Sylvia Development's obtaining the necessary zoning approvals to increase the property's allowable residential density from 22 lots to at least 38 lots.

Dohnal filed an application on behalf of Sylvia Development with Calvert County in May 1989 to designate the property as a Transfer Zone District ("TZD"), which would allow the increase in density necessary to build Blue Dolphin Estates. The County's TZD regulations are a component of its Agricultural Land Preservation Program. *See* Calvert County Code § 12–101 *et seq.* A "transfer zone" is an area "designated by the county commissioners as an area where development rights may be used to increase the density of residential use." § 12–101(i). In essence, the TZD regulations enable prospective developers to purchase unused "development rights" from participating agricultural landowners in exchange for the sellers' commitments to preserve their land as undeveloped and rural. Through the use of TZDs, the County seeks to preserve prime farm and forest land by relocating development without affecting the County's overall permitted residential density. *See* Calvert County Zoning Ordinance § 4–3.01.

Ultimate authority for designating TZDs rests with the County Board of Commissioners ("the Board" or "the County Board"), although the Board must first seek the recommendation of the County Planning Commission. *See* Zoning Ordinance § 4–3.02. Once the County Planning Commission reviews the application and makes a recommendation, the County Board must hold a duly-advertised public hearing and determine whether the proposed development complies with various land use ordinances and regulations and other criteria before approving the TZD designation. *See* Zoning Ordinance §§ 4–3.02 & 3.03.

Sylvia Development's TZD application for Blue Dolphin Estates received a favorable recommendation from the County Planning Commission in June 1989, subject to Sylvia Development's meeting certain conditions during subdivision review. As part of its review of the Blue Dolphin Estates proposal, the Planning Commission staff analyzed the proposal's traffic and environmental impacts and concluded that the proposal met all six of the criteria required for TZD approval. The Planning Commission also solicited comments from several state agencies with regard to traffic engineering, environmental protection, school capacity, and the provision

of public services. Upon receiving the favorable report of the Planning Commission, the County Board notified the public that a hearing on the application would be held on July 18, 1989.

At the July 18 hearing before the five-member County Board, numerous residents who lived in the vicinity of Hance Road testified in opposition to the Blue Dolphin project. Most of the residents commented on traffic and safety. One resident voiced her concern that "[t]here's so much traffic now that I can not pull out of my driveway safely," while another told of several fatalities that had already occurred on the narrow local roads. Other residents questioned whether the project would deplete fresh water reserves and warned that the development would harm wildlife. While the citizens who spoke at the hearing raised a number of different objections, one common theme ran throughout their testimony: a deep concern, expressed passionately by some, that the rural character of the area in which they had lived for years was being destroyed by residential developments like Blue Dolphin. As one resident put it:

> I'm 58 years old, I won't be around here much longer, but I've got children and grandchildren that hope to live here. I've lived here all my life and I'm used to rural country. I know it's getting away from us.... Folks, I'm telling you, we've got to put a stop to it, and you're the folks up there that can do this.

Another resident, a community activist who was apparently one of the more vociferous commentors on July 18, summed up the anti-development mood in the audience:

> You know, I'm proud to say that I live in the country and I'd like to continue to do so. What you're saying right now, is I can say I live in the country but it's behind a subdivision. I don't want to say that.

Dohnal was allowed to respond to the citizens' comments at the hearing. During his response, Dohnal criticized "the garbage and the lack of aesthetics of one of the inhabitants" of Hance Road. According to the deposition testimony of several persons present on July 18, the hearing became emotionally charged after Dohnal's disparaging comment.

An African–American resident, who believed that Dohnal was associating her with the garbage-strewn property, interrupted Dohnal and later expressed that she was "incensed" at Dohnal's insinuation. When the resident sat down, the public testimony ended with the following exchange between Commissioner William T. Bowen and the community activist who spoke earlier:

> Activist: I'd like to know where this developer comes from?
>
> Bowen: I think that has no bearing on this hearing.
>
> Activist: Well it's outside people coming in here and developing Calvert County.
>
> Bowen: Any other comments? Is the Board prepared to act at this time?

After further discussion and debate among the five board members, the Board decided to deny Sylvia Development's TZD application by a vote of three to two. A simple majority was required for approval.

In their comments, made on the record, all three of the board members who voted against Blue Dolphin Estates cited the significant public opposition expressed at the hearing as a reason for their decision. The Board issued its official denial of Dohnal's application in a resolution dated August 22, 1989. The Board's resolution rested on three findings: (1) the Board concluded that, in light of the public testimony, the local roads were inadequate to accommodate increased residential density; (2) the Board was persuaded by an unidentified consultant's report "setting forth the general inadequacy of water availability for fire fighting"; and (3) the Board determined that issuing this TZD "would be contrary to the public interest of Calvert County at this time."

Sylvia Development and Dohnal timely appealed the Board's resolution to the Circuit Court for Calvert County. In May 1990, the Circuit Court reversed the Board's decision as unsupported by probative evidence. The court's opinion explained that under Maryland law the Board, sitting as an adjudicative body in a TZD application hearing, was required to render a final decision with findings of fact based upon substantial evidence in the record. In the case of Blue Dolphin Estates,

the court found that the only support in the record for the Board's finding of inadequate road access consisted of the "unsubstantiated, generalized concerns" of local residents. Such lay testimony, without more, could not be considered probative in the face of contrary expert evidence produced by engineers from the County Planning Commission and several state agencies. The court also summarily rejected the Board's second and third findings, as the consultant's report on water supply was never admitted into the record and the "contrary to public interest" determination was asserted without any factual basis. The court held that an adjudicative agency decision made without the support of any record evidence was by definition "arbitrary" and ordered the Board to grant Sylvia Development's TZD application. The Board did so in a resolution issued July 3, 1990.

Thus, while Sylvia Development and Dohnal were successful on appeal, the initial denial of Sylvia Development's TZD application caused an 11–month delay in obtaining the necessary zoning approval. During this 11–month period, the Board approved the TZD application of another developer, Brooke Kaine, for a subdivision of 26 lots called "Olde Mill." Kaine needed the TZD approval to develop a 63–acre tract directly across Hance Road from the proposed Blue Dolphin subdivision. The County defendants concede that the proposals of Kaine and Dohnal were "similarly situated" for purposes of the TZD review process, at least in terms of the layout and location of the respective tracts of land. Once Kaine received approval for Olde Mill in February 1990, he was able to obtain the necessary further approvals and to proceed with construction and the sale of the lots. Thus, even though Kaine had applied for TZD designation after Sylvia Development, because of the 11–month delay in Sylvia Development's obtaining its TZD approval, Kaine was able to jump in front of Sylvia Development and secure the necessary certification of availability of school facilities, a certification which Sylvia Development could not obtain until October 1991. By that time, Sylvia Development alleges, it had defaulted on its loans and the Blue Dolphin project had been lost to foreclosure.

In August 1992, Sylvia Development and Dohnal sued Calvert County, the County Board of Commissioners, and the three individual Board members who blocked the Blue Dolphin project under 42 U.S.C. §§ 1983 and 1985(3), alleging (1) that the County defendants unlawfully discriminated against Sylvia Development and Dohnal "based on [Dohnal's] ethnic background and immigrant status, and/or non-resident status in Calvert County" in violation of the Equal Protection Clause; (2) that defendants conspired to deprive Sylvia Development and Dohnal of equal protection of the laws; and (3) that the defendants' "arbitrary, capricious, and invidiously discriminatory" denial of Sylvia Development's TZD application constituted a denial of property without due process of law under the Fourteenth Amendment. The district court granted defendants' motion for summary judgment on all counts, 842 F.Supp. 183, and this appeal followed.

## II

In reviewing a summary judgment, we apply *de novo* the same standard that the district court was required by law to apply for granting the motion for summary judgment. *See Temkin v. Frederick County Comm'rs,* 945 F.2d 716, 718 (4th Cir.1991), *cert. denied,* 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992). Once a defendant makes a properly supported motion for summary judgment, the burden shifts to the plaintiff to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is justified if, from the totality of the evidence presented, including pleadings, depositions, answers to interrogatories, and affidavits, the court is satisfied that there is no genuine factual issue for trial and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c).

In reviewing a motion for summary judgment, the court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion." *Tuck v. Henkel Corp.,* 973 F.2d 371, 374 (4th Cir.1992), *cert. denied,* ——

U.S. ——, 113 S.Ct. 1276, 122 L.Ed.2d 671 (1993). But as we explained in *Ford Motor Co. v. McDavid*, only "reasonable" inferences from the evidence need be considered by the court:

> [I]t is the province of the jury to resolve conflicting inferences from circumstantial evidence. Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture.

259 F.2d 261, 266 (4th Cir.), *cert. denied,* 358 U.S. 908, 79 S.Ct. 234, 3 L.Ed.2d 229 (1958). Whether an inference is reasonable cannot be decided in a vacuum; it must be considered "in light of the competing inferences" to the contrary. *See Matsushita Elect. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). In the end, the non-moving party must do more than present a "scintilla" of evidence in its favor. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. Rather, the non-moving party must present sufficient evidence such that "reasonable jurors could find by a preponderance of the evidence" for the non-movant, *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512, "for an apparent dispute is not 'genuine' within contemplation of the summary judgment rule unless the non-movant's version is supported by sufficient evidence to permit a reasonable jury to find the fact[s] in his favor." *Stone v. University of Maryland Medical Sys. Corp.,* 855 F.2d 167, 175 (4th Cir.1988). Thus, if the evidence is "merely colorable" or "not significantly probative," a motion for summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

### III

We turn first to Sylvia Development and Dohnal's claim that the Calvert County Board of Commissioners, in denying Sylvia Development's TZD application, violated the Equal Protection Clause of the Fourteenth Amendment. Sylvia Development and Doh-

nal contend that their project, "Blue Dolphin Estates," was similarly situated to the project of a local developer, "Olde Mill," but Olde Mill was granted TZD approval while Blue Dolphin Estates was denied approval. Sylvia Development and Dohnal argue that the Board's stated reasons for the denial were arbitrary and that the real reason was Dohnal's status as an "outsider." They variously imply that Dohnal's "outsider" status stems from the fact that Dohnal is a "naturalized alien," an "immigrant" from Czechoslovakia, a "foreigner," or a non-Calvert County resident.[1] The County Board's intent in denying Sylvia Development's TZD application, appellants assert, "was to placate public opinion against any and all outsiders whom the populace disliked." Appellants argue that they produced facts which at least entitled them to a trial on the equal protection issue and that summary judgment was therefore improperly entered.

■ The Equal Protection Clause of the Fourteenth Amendment, which provides in deceptively simple language that a state may not "deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend. XIV, § 1, lies at the core of our rule of law. It requires that the states apply each law, within its scope, equally to persons similarly situated, and that any differences of application must be justified by the law's purpose. But this does not mean that persons in different circumstances cannot be treated differently under the law. Rather, the essential command of the Equal Protection Clause has always been that the classification of persons which a law applies must be "reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation." *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920).

■ The Equal Protection Clause limits *all* state action, prohibiting any state from denying a person equal protection through the enactment, administration, or enforcement of its laws and regulations. Even

---

1. Dohnal was born in Czechoslovakia, became a naturalized U.S. citizen in 1976, and at the time of this litigation resided in Anne Arundel County, Maryland.

though a state law is facially neutral, its administration or enforcement can effect an unequal application by favoring one class of persons and disfavoring another. If the classification utilized is explicitly stated on the face of a statute or in the reasons given for its administration or enforcement, then the equal protection analysis requires us to determine whether an appropriate relationship exists between the legislative purpose and the classification adopted to achieve that purpose. On the other hand, if a classification is not explicitly stated, the plaintiff bears the initial burden of proving that a classification was nonetheless intentionally utilized. *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944). And only if the use of a classification is thus established does the equal protection analysis proceed with the inquiry into whether the classification furthers a legitimate legislative purpose.

 To prove that a statute has been administered or enforced discriminatorily, more must be shown than the fact that a benefit was denied to one person while conferred on another. *Snowden*, 321 U.S. at 8, 64 S.Ct. at 401. A violation is established only if the plaintiff can prove that the state *intended* to discriminate:

> The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it *an element of intentional or purposeful discrimination.*

*Id.* (emphasis added). Thus, even when a facially neutral statute has a "racially disproportionate impact," a discriminatory animus must nevertheless be proved to establish an equal protection violation. *See Washington*

*v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). A facially neutral administrative action implementing a facially neutral zoning regulation is treated similarly. Thus, even when an administrative action disparately impacts members of a particular racial group, it will not be found to violate the Equal Protection Clause unless the plaintiff demonstrates that the action was motivated, at least in part, by an "invidiously discriminatory" intent. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir.1982); *Talbert v. City of Richmond*, 648 F.2d 925, 929 (4th Cir.1981), *cert. denied*, 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982).[2] Several factors have been recognized as probative of whether a decisionmaking body was motivated by a discriminatory intent, including: (1) evidence of a "consistent pattern" of actions by the decisionmaking body disparately impacting members of a particular class of persons; (2) historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (3) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (4) contemporary statements by decisionmakers on the record or in minutes of their meetings. *See Arlington Heights*, 429 U.S. at 266–68, 97 S.Ct. at 564–65; *Talbert*, 648 F.2d at 929. In the end, the plaintiff has the burden of establishing that a classification introduced through administrative action was "clear and intentional." *Snowden*, 321 U.S at 8, 64 S.Ct. at 401.

**2.** We note also that discriminatory intent "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979) (internal citations omitted). Further, we recognize that there is an element of causation that is a necessary part of plaintiff's showing, especially when plaintiff is trying to uncover the motivation of a

multi-member decisionmaking body, such as a zoning board. While a plaintiff is not required to prove that "the challenged action rested *solely* on racially discriminatory purposes," *Arlington Heights*, 429 U.S. at 265, 97 S.Ct. at 563 (emphasis added), proof that racial discrimination was *a* motivating factor would not end the matter. Such proof merely shifts the burden to the decisionmaking body to demonstrate that "the same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 270–71 n. 21, 97 S.Ct. at 566 n. 21.

In short, where a classification does not appear on the face of a statute and is not officially stated as a reason for administrative action, the plaintiff has the burden of proving that the classification was actually utilized in the administrative action and that its use was intentional and purposeful.

■ Whether a statute or administrative action employs a classification explicitly or implicitly, the equal protection analysis of that state action consists of the same two components. The first, a substantive component, requires us to examine whether the end that the state seeks to achieve is a legitimate governmental purpose. In determining whether a statutory purpose is legitimate, substantial judicial deference is required so that the court does not substitute its value judgments for those established by the democratically chosen branch. *United States v. Commonwealth of Virginia ("VMI II")*, 44 F.3d 1229, 1236 (4th Cir.1995). "[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). This deference to legislative will, however, must not lead to approval of a "pernicious legislative purpose or one that does not comport with traditional notions of the proper role of government." *VMI II*, 44 F.3d at 1236. Because of the necessary judicial deference to the state's legislative purpose, statutes or administrative actions are seldom struck down under this component of the equal protection analysis.

■ The second component of the equal protection analysis, the procedural component or means analysis, examines whether the classification appropriately furthers the legislative purpose. As a general proposition, legislation will be sustained if the classification utilized by the statute is "rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Thus, when social or economic legislation is involved, the states are permitted wide latitude in adopting classifications to further legitimate governmental purposes. *Id.; see also Dukes*, 427 U.S. at 303, 96 S.Ct. at 2516. When a statute, however, classifies by race, alienage, or national origin, it is subjected to "strict scrutiny and will be sustained only if [the legislative means] are suitably tailored to serve a compelling state interest." *Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States*, 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943). And for that reason classifications based on racial descent can be justified only in the "most exceptional circumstances," *Oyama v. California*, 332 U.S. 633, 646, 68 S.Ct. 269, 275, 92 L.Ed. 249 (1948), requiring the "most rigid scrutiny." *Korematsu v. United States*, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944).

■ Sylvia Development and Dohnal contend in this case that the Calvert County Board discriminated against them because of Dohnal's status either as a Czech immigrant or as a non-county resident. Thus, while we recognize that a classification based on Dohnal's ethnic origin—if established—requires the most rigid scrutiny, demanding a compelling state interest for its justification, we see no reason to employ any but the most deferential level of scrutiny to a classification based on his residence outside of the county. The Supreme Court has never applied anything greater than a rational basis level of review in cases involving equal protection challenges to bona fide residence requirements. *See, e.g., Martinez v. Bynum*, 461 U.S. 321, 103 S.Ct. 1838, 75 L.Ed.2d 879 (1983) (upholding state statute permitting public schools to deny free tuition to students whose official residence is outside the school district); *County Bd. of Arlington County v. Richards*, 434 U.S. 5, 98 S.Ct. 24, 54 L.Ed.2d 4 (1977) (upholding local ordinance reserving free parking permits for local residents and their invitees). The Court in *Martinez* specifically held that there is nothing invidious about a bona fide residence requirement, so long as it is uniformly applied and does not deprive nonresidents of a "fundamental right." 461 U.S. at 328 n. 7, 103 S.Ct. at

1842 n. 7. Therefore, "the question is simply whether there is a rational basis for it." [3] *Id. But cf. Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (striking down a *durational* residency requirement which conditioned public assistance on a minimum one-year residence in the jurisdiction because it impinged on the constitutional right to travel); *Attorney General of New York v. Soto–Lopez,* 476 U.S. 898, 903 n. 3, 106 S.Ct. 2317, 2321 n. 3, 90 L.Ed.2d 899 (1986) (distinguishing the Court's deferential treatment of bona fide residency requirements from its treatment of durational residency requirements).

In sum, in deciding the case before us we must first determine whether the County Board actually utilized an implicit classification in administering its zoning ordinance, since Sylvia Development and Dohnal do not contend either that the ordinance was discriminatory on its face or that the Board's reasons for denying their application articulated a discriminatory intent. Thus, at the outset we must determine whether Sylvia Development and Dohnal have met their burden of establishing that the County Board denied Sylvia Development's application *because* Dohnal was a Czech immigrant or *because* he was a non-resident. In either case, the use of the classification must be clear and intentional. Only if we conclude that the County's decision utilized one of these two classifications will we proceed to determine whether the classification appropriately supported a legitimate governmental objective.

With these principles in hand, we proceed to examine Sylvia Development and Dohnal's equal protection claims.

## IV

Since, as we have noted, both the announced reasons for denying Sylvia Development's TZD application and the ordinance under which the County Board acted are facially neutral, we begin by examining whether Sylvia Development and Dohnal produced sufficient facts to show that the Board's decision was based, at least in part, on the fact either that Dohnal was a Czech or that he was not a resident of Calvert County.

As far as appellants' claim that Dohnal's ethnic origin was a motivating factor in the County Board's decision, we have been directed to no evidence of any history of actual discrimination against Czechs, Eastern Europeans, or immigrants in general, by the County Board or any other entity in Calvert County. Neither is there any evidence, or assertion by Sylvia Development and Dohnal, that the Board in any way departed from its usual procedural sequence in processing their application and administering the public hearing. Instead, appellants' evidence centers around certain remarks made at the public hearing on Sylvia Development's TZD application and an alleged pattern of discrimination against immigrants by the Calvert County Board when considering TZD applications.

■ Sylvia Development and Dohnal's efforts to establish a triable issue of fact consist of four pieces of evidence. First, they point to a statement made at the hearing by defendant Barbara Stinnett, one of three board members who voted against the Blue Dolphin proposal. At the conclusion of her remarks, Stinnett said, "I think it's time that the wishes and the rights of the people that live here and have property here are taken into account and are held with as much vim and vigor and respect *as those who are coming in here shoving things down our throats* " (emphasis added). While the summary judgment standard requires us to resolve conflicting inferences from circumstantial evidence in favor of the non-moving party, it does not allow us to ignore or distort the plain meaning of words or conveniently

**3.** In the instant case, for example, it is presumably a legitimate governmental purpose to preserve the rural nature of a community and to maintain its aesthetic and functional characteristics through zoning requirements. In relation to that purpose, it might be rational to conclude that persons with an interest in the community beyond simply a financial one will be more sensitive to the spirit of zoning requirements and more accountable to the community's desires. Non-local developers, for instance, do not have to live with the adverse consequences of their development projects. Nevertheless, this case does not require us to resolve the issue of whether a rational basis could be found for classifying developers by their residence.

to read them out of context. *See Ford Motor Co. v. McDavid,* 259 F.2d 261, 266 (4th Cir.), *cert. denied,* 358 U.S. 908, 79 S.Ct. 234, 3 L.Ed.2d 229 (1958). Even after resolving all available inferences in the light most favorable to appellants, we see no possible way to read Stinnett's remarks about "those who are coming in here" as a reference to non-U.S. natives. The full context of Stinnett's statement reveals at most that she was remonstrating against the Board for catering to outside developers *of any origin* who would impose unwanted development and growth on the local community. A more extensive excerpt from Stinnett's remarks discloses this meaning:

> I see faces that I've seen all my life in this room, people who have lived here all their lives, because [they're] coming out and [they're] standing up and saying, we're tired of this and we don't want any more of this. People are tired of having development shoved down their throat.... [O]ur tax payers, and our people that live in this County ... are footing the bills for this growth, and we can't continue to do it .... it can't continue. It just can't continue.

While Stinnett may have intended to set up a "we/they" dichotomy, the "we" obviously refers to the residents and tax payers of Calvert County, and the "they" just as obviously refers to *any* developer who would destroy the County's rural character—not merely foreign-born developers.

The second piece of evidence on which Sylvia Development and Dohnal rely is the deposition testimony of Mark Frazer, one of the commissioners who voted *in favor* of the Blue Dolphin proposal. Specifically, Frazer testified that Dohnal spoke with a discernible foreign accent at the hearing (Frazer was actually one of several people who remembered that Dohnal had an accent, though most, including Frazer, believed it was a "German" accent). At one point in his deposition, Frazer also recalled that there was an emotional outburst during the hearing in which "there may have been some reference [made] to Mr. Dohnal's ethnicity only because, I think, of his accent." What Sylvia Development and Dohnal overlook, however, is Frazer's immediate caveat that he could not recall whether that reference stemmed from a commissioner or from someone in the audience. Frazer acknowledged that "the transcript would reflect that. That is the best that I can recall." A careful review of the transcript of the Board's remarks, however, reveals not a single explicit or implicit reference to Dohnal's ethnicity. Indeed, later in his deposition testimony, Frazer recalled that the emotional outburst, the details of which he only vaguely remembered, did not stem from the commissioners, but occurred in an exchange between Dohnal or his representative and other persons in the audience. Moreover, Frazer testified that he could not recall any matter before the Board in which he believed that a commissioner's vote was influenced by a person's nationality or racial background. He testified that he could state "very forthrightly" that he "never heard discussions or felt any sense of prejudice among any of the board members with respect to any applicant's or resident's nationality or sex or color, race, religion."

Sylvia Development and Dohnal's third piece of evidence is a statement made by a local resident, referred to above as the "community activist," in an exchange with Commissioner William T. Bowen which concluded the public testimony segment of the hearing.

> Activist: I'd like to know where this developer comes from?
>
> Bowen: I think that has no bearing on this hearing.
>
> Activist: Well it's outside people coming in here and developing Calvert County.
>
> Bowen: Any other comments? Is the Board prepared to act at this time?

This solitary remark is the only statement in the entire transcript of the public hearing which even touches on the question of Dohnal's status as an outsider. Read in the context of the community activist's earlier testimony, and in the context of the hearing as a whole, it would be a gross distortion to assume that by "outside people" she meant foreign-born developers. And while it would be a difficult task in any case to convince this court to project the feelings of a single audience member onto the members of a decisionmaking body, such a task is made nearly impossible in this case given Commissioner

Bowen's hasty dismissal of the community activist's question.

Additionally, Sylvia Development and Dohnal attempt to establish a pattern of discriminatory impact by showing that the Board consistently denied the applications of foreign-born TZD applicants. While it is true that discriminatory impact, if shown, may be probative (though not dispositive) on the issue of intent, *see Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 564, appellants' statistical evidence in this case is not even probative of discriminatory impact. Appellants note that between 1987 and 1990 the County Board approved 31 of 34 applications for TZD designation and that of the three applications denied, two were submitted by immigrants: Dohnal and David Lewis, who, according to his resume was a naturalized U.S. citizen born in Zimbabwe.[4] Accepting these data as true, they fall far short of demonstrating that the Board, in considering 34 TZD applications, manifested the "consistent pattern" of action described by the *Arlington Heights* Court as probative evidence of purposeful discrimination. No conclusion can be drawn from the simple fact that of 34 applicants, two immigrants were turned down. Any meaningful statistical pattern must take into account all 34 applicants. Yet Sylvia Development and Dohnal provide no information about the national or ethnic origins of the 31 applicants who were granted TZD approvals. Evidence that some of these successful applicants were also foreign-born would likely dispel any inference that the Board was systematically discriminating against immigrants.

Equally as important as appellants' failure to examine the entire pool of 34 applicants is their failure to produce sufficient data on the voting records of the individual commissioners who voted against their application. It is undisputed in this case that two of the commissioners, Joyce Terhes and Barbara Stinnett, were openly hostile to unchecked growth and therefore often voted to deny TZD applications. Terhes voted to deny 24 of the 34 TZD applications under discussion, and Stinnett voted to deny at least 17. Dohnal and Sylvia Development provide no evidence about the national origins of those applicants whom Terhes and Stinnett voted against, leaving us with the non-probative statistics that 2 of 24 TZD applicants voted against by Commissioner Terhes and 2 of 17 voted against by Commissioner Stinnett were foreign-born. Even as to Commissioner Bowen, who voted against TZD applicants four times,[5] with Dohnal and Lewis being the only two of those applicants who were foreign-born, the fact that appellants provide no data on the heritage of the 30 applicants whom Bowen approved leaves the statistic meaningless.[6]

■ In sum, the evidence produced by the appellants fails to show a clear intent by the Board to discriminate on the basis of racial or immigrant status. Indeed, there is no evidence to show that the Board was even aware of Dohnal's place of birth, other than the fact that Dohnal speaks with a discernible foreign accent. Without more, a reasonable trier of fact cannot conclude that the County Board discriminated against Sylvia Development and Dohnal merely because

4. Though born in Zimbabwe, Lewis' resume indicates that he was educated in South Africa and Canada, and before coming to the U.S. around 1971, lived and worked as an engineer in Canada. Even if we assume for summary judgment purposes that the Board was aware of this biographical information on his resume, the record contains not a scintilla of evidence that Lewis' personal history was discussed by the Board, raised by anyone at Lewis' public hearing, or in any way played a role in the Board's deliberations. Like Dohnal, Lewis' denial was reversed by the Calvert County Circuit Court as unsupported by an adequate evidentiary record, but also like Dohnal, the court raised no suspicion of discrimination as the reason for the denial. Thus, Sylvia Development and Dohnal are left

with the bare statistical data that two out of three *unsuccessful* TZD applicants were naturalized U.S. citizens.

5. The record shows that Bowen switched his vote in one of these cases at a rehearing six months after the initial denial. For this reason, appellants contend that Bowen ultimately voted against only three.

6. While it is not necessary to consider evidence advanced by the County defendants, we note that they provided further explanations of the board members' voting patterns which indicate plausible, nondiscriminatory reasons for why these members voted as they did.

Dohnal had a foreign accent, just as racial or gender discrimination cannot be presumed from the mere fact that someone adversely affected by state action has a particular skin color or gender. We conclude that appellants failed to create a triable issue of fact on the issue of discrimination based on Dohnal's immigrant status or ethnic background.

If Sylvia Development and Dohnal cannot demonstrate discrimination based on Dohnal's Czech origin, they argue in the alternative that the Board discriminated against them because Dohnal is an out-of-county developer. But while appellants' argument on this point is stronger, they likewise fail to proffer sufficient facts to survive summary judgment on this theory of discrimination.

Sylvia Development and Dohnal contend that if Commissioner Stinnett's comment about "those who are coming in here shoving things down our throats" cannot be read as a xenophobic comment about Czechs or foreigners, then it must be interpreted to refer specifically to out-of-county developers. In the context of the entirety of her remarks, however, Stinnett surely meant developers in general, regardless of where they happened to reside. The generality of her opposition to development is made especially clear by her preceding comment to the effect that "People are tired of having development"—presumably regardless of the developers' residence—"shoved down their throats."

Sylvia Development and Dohnal make a more salient point with respect to the outburst of the resident, whom we referred to as the "community activist," who inquired, "I'd like to know where this developer comes from." Appellants add to this evidence Commissioner Mark Frazer's deposition testimony, which included his interpretation of the activist's subsequent comment, "Well, it's outside people coming in here and developing Calvert County." When asked to read the transcript of the activist's remarks, Frazer interpreted her comments as a "[k]ind of a slur on developers, particularly out-of-the-county developers coming in and disrupting our quality of life."

■ Even taken in the light most favorable to appellants, however, the community activist's remarks tend to prove only one thing: that she personally did not think highly of out-of-county developers. While the discriminatory motivations of people who testify before a decisionmaking board might in limited circumstances be probative of the board's motivations, this could be true only where public testimony was overwhelmingly opposed to a proposal for a distinct discriminatory reason, and board members were clearly swayed by that public opposition, fully aware of its basis in discrimination and prejudice. *See, e.g., Marks v. City of Chesapeake*, 883 F.2d 308, 312 (4th Cir.1989) (zoning board admittedly swayed by community's religious prejudice); *Smith v. Town of Clarkton*, 682 F.2d at 1066–67 (town officials clearly reacting to public's racial hostility). In this case, the community activist was only one of eleven citizens who testified at the July 18 hearing, and the transcript reflects not a single other comment or question by anyone on the subject of Dohnal's out-of-county residence. Furthermore, as we noted above, Commissioner Bowen effectively and appropriately thwarted any further inquiry into where Dohnal "comes from" by noting the irrelevance of the activist's question and terminating the hearing. In the ensuing debate among the commissioners on the record, no further reference was made to the activist's remarks. On these facts, we find that a trier of fact could not reasonably impute to the County Board the motivations of a single audience member who made one isolated comment, and thus that summary judgment for the County defendants was appropriate on the claim of discrimination based on Dohnal's out-of-county residence.

■ Notwithstanding appellants' inability to show that the County Board took either Dohnal's ancestry or residency into account in making its decision, appellants argue that they established a prima facie equal protection claim merely because a state court ruled that the initial denial of Sylvia Development's TZD application was arbitrary as a matter of state law. According to appellants' logic, the fact that the County Board arbitrarily denied the TZD application for "Blue Dolphin Estates" while approving the TZD application (of another developer) for "Olde Mill," combined with the "Appellees' concession that

the Blue Dolphin and Olde Mill projects were similarly situated, compels the conclusion that Appellants made out a *prima facie* case of deprivation of equal protection."

■ We reject appellants' theory as a matter of law. While an equal protection claim must be rooted in an allegation of unequal treatment for similarly situated individuals, a showing of such disparate treatment, even if the product of erroneous or illegal state action, is not enough by itself to state a constitutional claim. "[W]here the official action purports to be in conformity to the statutory classification, an erroneous or mistaken performance of the statutory duty, although a violation of the statute, is not without more a denial of the equal protection of the laws." *Snowden*, 321 U.S. at 8, 64 S.Ct. at 401. If disparate treatment alone were sufficient to warrant a constitutional remedy, then every blunder by a local authority, in which the authority erroneously or mistakenly treats an individual differently than it treats another who is similarly situated, would rise to the level of a federal constitutional claim. *See id.* at 11–12, 64 S.Ct. at 403 ("A construction of the equal protection clause which would find a violation of federal right in every departure by state officers from state law is not to be favored.").

The fact that the Board's differential treatment of two similar proposals was ruled illegal or arbitrary under state law is not alone probative of a constitutional violation. *See, e.g., Sunday Lake Iron Co. v. Wakefield,* 247 U.S. 350, 353, 38 S.Ct. 495, 495–96, 62 L.Ed. 1154 (1918); *E & T Realty v. Strickland,* 830 F.2d 1107, 1114 (11th Cir.1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988). As we noted above, even if the enforcement of a facially neutral ordinance has a "racially disproportionate impact," a violation of the Equal Protection Clause still requires a showing of clear and intentional discrimination. *See Washington v. Davis,* 426 U.S. at 239, 96 S.Ct. at 2047. Likewise, a showing of disproportionate impact on any other class of persons would not, without more, establish an equal protection violation. And proof of discriminatory intent is no less necessary if the enforcement action is unlaw-

ful; the fact of its illegality does not prove that it was discriminatory.

In this case, confusion also arises because appellants conflate the meaning of the term "arbitrary" as used by the state court in applying state administrative law with the term "arbitrary" as it might be used in a constitutional sense. It does not follow, as appellants contend, from the fact that the Board's action was arbitrary as a matter of state law that there was "no rational basis ... to support the denial of Sylvia Development's application for the TZD." The Board did indeed have a rational basis for the denial: avoiding an adverse impact on traffic safety and water supply. The Board's action was ruled "arbitrary" not because its reasoning lacked a rational basis, but because the evidentiary record was inadequate to support the Board's findings. This failure is simply a matter of state law.

In sum, the most appellants could prove if this case were permitted to go to trial is that two similarly situated developers were treated differently by a local zoning board, without an adequate evidentiary basis for such treatment. Appellants cannot show that the County Board's decision was based in whole or in part on a deliberate classification that he was Czech, an immigrant, or a non-resident. The district court thus was compelled to grant summary judgment for defendants on the equal protection claim.

Because there was a lack of evidence to support the allegation of intentional discrimination, Sylvia Development and Dohnal's second count alleging a *conspiracy* to deny them equal protection must also be dismissed on summary judgment.

## V

The third count of Sylvia Development and Dohnal's complaint alleges that the County defendants denied them a property interest without due process of law in violation of the Fourteenth Amendment. First they contend that they had a property interest in the approval of a TZD because, they argue, their application met all the criteria for a TZD, as stated in the Calvert County ordinances, and therefore they were *entitled* to approval of

their application. They also contend that because the defendants denied their application with *no* evidence to justify such a decision, the County Board's decision was "arbitrary," in violation of the Due Process Clause.

▉ If appellants purport to claim that Calvert County denied them *procedural* due process, then they must establish that (1) they had property or a property interest (2) of which Calvert County deprived them (3) without due process of law. Because appellants failed to demonstrate at least two of the required elements, their procedural due process claim must fail.

▉ First, Sylvia Development cannot establish that it has a property interest in a TZD created by Calvert County's Agricultural Land Preservation Program. *See* Calvert County Code § 12–101 *et seq.* According to Calvert County Zoning Ordinance § 4–302, the creation of a TZD at any particular location in the County is discretionary with the County Board. Thus, Sylvia Development cannot claim entitlement to a TZD on its property, and approval of a TZD accordingly cannot be claimed by Sylvia Development as a property interest. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (to have a property interest in a benefit a person must have a "legitimate claim of entitlement to it"). *See also Biser v. Town of Bel Air,* 991 F.2d 100 (4th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993).

In furtherance of its Agricultural Land Preservation Program, the County Board is required to establish transfer zones to serve as "receiving area[s] for lots that are being transferred from prime farm and forest land." Zoning Ordinance § 4–3.01. While Transfer Zone Districts must be created, *see* Calvert County Code § 12–105, their location and approval rest within the discretion of the County Board of Commissioners. This is evident not only in the enabling portion of the ordinance which states, "The County Commissioners *may* designate a TZD if all criteria for a TZD are met," Zoning Ordinance § 4–3.02 (emphasis added), but also in the ordinance's language regarding where such zones may, but need not, be located:

While the Comprehensive Plan recommends that residential development be directed to Towns, the Comprehensive Plan also recognizes that some people desire home sites "out in the country." Therefore, by locating Transfer Zone Districts on less viable farmland, the demand for land "out in the country" can be satisfied without usurping important productive resources and without destroying the rural character of the County.

Zoning Ordinance § 4–3.01.

Moreover, the criteria imposed by the zoning ordinance for land to qualify as a TZD does not, as appellants argue, *entitle* land meeting these qualifications to TZD status. Rather, the criteria are *preconditions* which must be met before land can be *considered* for TZD approval. As the ordinance states: "The following criteria must be met *if an area is to be acceptable* as a Transfer Zone District." Zoning Ordinance § 4–3.03 (emphasis added).

Further evidence that a TZD is not an entitlement is provided by the numerous reviews required in approving a TZD, many of which involve interpretive judgments and discretion. A TZD must satisfy the standards for any other development in Calvert County, including subdivision regulations, storm water management, sediment control, and road access requirements. *See* Zoning Ordinance § 4–3.03. While Sylvia Development may believe that if it satisfied the stated criteria, it would receive a TZD, that belief is at best a mere "unilateral expectation," *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709, because the question of whether criteria are met must be resolved by the exercise of judgment. To establish a property interest subject to a procedural due process analysis of the Fourteenth Amendment, a "legitimate claim of entitlement" must be shown. *Id.*

▉ Finally, we reject appellants' contention that an entitlement to the TZD was created either by the County Planning Commission's favorable recommendation or by the state court judgment in their favor. While the County Board must seek the recommendation of the County Planning Commission, the ordinance requires only that the

Board *consider,* but not follow, that recommendation. *See* Calvert County Code, § 12–105(a). As to the court judgment, a court order requiring the Board to approve the application does not mean that the applicant had a preexisting legal right to that approval. *See Biser,* 991 F.2d at 105. " 'The fact that the permit *could* have been denied on nonarbitrary grounds defeats the federal due process claim.' " *Gardner v. Baltimore Mayor & City Council,* 969 F.2d 63, 71 (4th Cir. 1992) (emphasis added) (quoting *RRI Realty Corp. v. Incorporated Village of Southampton,* 870 F.2d 911, 918 (2d Cir.1989)).

■ In addition to their failure to show the deprivation of a property interest, Sylvia Development and Dohnal assert no unfairness in the procedure afforded their application for a TZD except to say that the Board's decision was mistaken and lacked the support of evidence. As appellants must concede, the County Board duly conducted an open hearing, following notice, at which it heard the positions of all interested parties. And following the hearing, the Board made a decision and stated its reasons. Aggrieved by the decision, the appellants were entitled to appeal and did appeal to the Circuit Court for Calvert County in the manner provided by the ordinance. Moreover, they persuaded the circuit court to reverse the decision of the Board as unsupported by adequate evidence. Not only were appellants provided all the procedure to which they were entitled, they used the procedure to obtain a favorable result.

While appellants thus cannot make out a procedural due process claim, it appears from their allegations that they may also be intending to allege that Calvert County denied them *substantive* due process. They state in the complaint that the County Board's decision was "arbitrary" without support of any evidence. Appellants' brief also cites a Second Circuit opinion to support their contention that "if the [Appellees] had no authority under state law" to deny Sylvia a TZD, "then a trier of fact could conclude that there was no 'rational basis' " for Appellees' actions, "and that, as a result, the [Appellees] violated appellants' rights to substantive due process" (quoting *Brady v.*

*Town of Colchester,* 863 F.2d 205, 215–16 (2d Cir.1988)). But even if appellants' claim alleges a violation of substantive due process, we conclude that it is most inadequate.

■ To make out a claim that Calvert County's action violated *substantive* due process, appellants must, in the circumstances of this case, demonstrate (1) that they had property or a property interest; (2) that the state deprived them of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that *no process* could cure the deficiency. *See Love v. Pepersack,* 47 F.3d 120, 122 (4th Cir.1995) ("Substantive due process is a far narrower concept than procedural; it is an absolute check on certain governmental actions notwithstanding 'the fairness of the procedures used to implement them.' "). The protection of substantive due process is indeed narrow and covers only state action which is "so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." *Rucker v. Harford County,* 946 F.2d 278, 281 (4th Cir.1991), *cert. denied,* 502 U.S. 1097, 112 S.Ct. 1175, 117 L.Ed.2d 420 (1992). And in the context of a zoning action involving property, it must be clear that the state's action " 'has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense.' " *Nectow v. Cambridge,* 277 U.S. 183, 187–88, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928) (quoting *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926)). In more recent decisions, the Supreme Court has narrowed the scope of substantive due process protection in the zoning context so that such a claim can survive only if the alleged purpose behind the state action has no conceivable rational relationship to the exercise of the state's traditional police power through zoning. *See Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *but cf. Moore v. City of*

*East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (city's requirement that families exclude blood relatives violates substantive due process). In short, the doctrine of substantive due process is a constitutionally imposed limitation, *see Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 229, 106 S.Ct. 507, 515, 88 L.Ed.2d 523 (1985) (Powell, J., concurring), which is intended only "to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" *Collins v. City of Harker Heights,* 503 U.S. 115, 126, 112 S.Ct. 1061, 1069, 117 L.Ed.2d 261 (1992) (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989)).

 In addition to the fact that Sylvia Development and Dohnal cannot demonstrate, as we noted above, that Calvert County deprived them of a property interest, their substantive due process claim must fail also because of their inability to show that the County Board's action bore no rational relationship to the exercise of the state's traditional police power through zoning. The state court which reversed the Board found that the Board had rejected Sylvia Development's application for two main reasons: (1) the Board's impression that Blue Dolphin Estates would create a traffic hazard and deplete water supplies; and (2) the Board's desire to placate the citizens at the hearing who opposed the project. While the state court held that the first reason could not stand up under state law without admissible evidence to support it, one cannot deny that the impact of development on traffic safety and water supply is quintessentially a legitimate zoning concern.

 Sylvia Development and Dohnal argue, however, that the first reason was merely a pretext for the second, the commissioners' desire to mollify public opposition to the Blue Dolphin project. In support of this contention, they point to the statements of certain board members who candidly admit they were swayed by public opposition, such as the following remarks of Commissioner Joyce Terhes:

[W]hen I left the house this morning and when I ran, I ran knowing it was a representative democracy and that I was elected to represent the wishes of the people. And the people of Calvert County have spoken out, they are concerned about the growth, they are concerned about the schools, they are concerned about the roads, they are concerned about the water.... I am not a rubber stamp for the Planning Commission.... I have letter after letter about people complaining about traffic on Hance Road.... I'm sorry, I will not accept it.

Even if Sylvia Development and Dohnal are correct that appeasing the public was the only purpose behind the Board's action, in the context of this case we still cannot say that the Board's action bore no rational relationship to the exercise of the state's traditional zoning power. Given the nature of the citizens' opposition, it is clear that the Board was acting well within the ambit of a local zoning authority for purposes of our constitutional analysis.

Zoning is inescapably a political function. Indeed, it is the very essence of elected zoning officials' responsibility to mediate between developers, residents, commercial interests, and those who oppose and support growth and development in the community. We stated as much in *Gardner:*

[L]and-use decisions are a core function of local government. Few other municipal functions have such an important and direct impact on the daily lives of those who live or work in a community. The formulation and application of land-use policies, therefore, frequently involve heated political battles, which typically pit local residents opposed to development against developers and local merchants supporting it. Further, community input is inescapably an integral element of this system. Subdivision control is an inherently discretionary system that allows—indeed, sanctions—compromise and negotiation between developers and the planners who represent the community.

Resolving the routine land-use disputes that inevitably and constantly arise among developers, local residents, and municipal officials is simply not the business of the federal courts.... Accordingly, federal

courts should be extremely reluctant to upset the delicate political balance at play in local land-use disputes.

969 F.2d at 67–68 (internal citation omitted). The record in this case reveals that the public opposition to the Blue Dolphin project, as well as the sympathy to this opposition expressed by certain commissioners, centered around legitimate land use issues such as the concern over further growth in rural Calvert County, the consequences of increased residential density, and the preservation of the community's aesthetic character—issues that are at the heart of countless local zoning disputes in every corner of the country. It is not pernicious *per se* for a zoning authority to be influenced by political pressure in the community. "Such give-and-take between government officials and an engaged citizenry is what democracy is about." *Id.* at 72. *See also Nestor Colon Medina & Sucesores, Inc. v. Custodio,* 964 F.2d 32, 46 (1st Cir. 1992) (" 'nothing is more common in zoning disputes than selfish opposition to zoning changes. The Constitution does not forbid government to yield to such opposition; it does not outlaw the characteristic operations of democratic ... government' ") (quoting *Coniston Corp. v. Village of Hoffman Estates,* 844 F.2d 461, 467 (7th Cir.1988)).

 Our analysis should not be interpreted as condoning the actions of public officials who circumvent legally established criteria in their decisionmaking. Actions that violate state law are properly challenged in state courts, as Sylvia Development and Dohnal have done in this case. But the legality of a zoning decision under applicable state law is not determinative of whether the decision violated federal substantive process[7] Moreover, the fact that established state procedures were available to address and correct illegal actions by the Board belies the existence of a substantive due process claim. *See Rucker,* 946 F.2d at 281.

At bottom, this case amounts to a routine zoning action by a county board which a state court later found to be unsupported by the evidence and therefore reversed. While the County Board announced perfectly acceptable reasons for its zoning decision, the decision was flawed because the evidence relied on by the Board was speculative. These are not the circumstances that demonstrate a violation of the Due Process Clause, either in its procedural or substantive application.

The judgment of the district court is *AFFIRMED.*

---

7. Appellants rely on broad sounding language in cases from other circuits, such as *Brady v. Town of Colchester,* 863 F.2d 205, 215 (2d Cir.1988) ("the principle of substantive due process assures property owners of the right to be free from arbitrary or irrational zoning actions"). *But see Nestor Colon Medina & Sucesores, Inc. v. Custodio,* 964 F.2d 32, 46 (1st Cir.1992) (declining to follow *Brady* ). But to conclude that every agency decision reversed as "arbitrary and capricious" under state or federal administrative law rises to the level of a constitutional claim would distort the substantive due process doctrine. As the courts have consistently recognized, the inquiry into "arbitrariness" under the Due Process Clause is completely distinct from and far narrower than the inquiry into "arbitrariness" under state or federal administrative law. *See Gardner,* 969 F.2d at 71 n. 3; *RRI Realty Corp. v. Incorporated Village of Southampton,* 870 F.2d 911, 914 n. 1 (2d Cir.), *cert. denied,* 493 U.S. 893, 110 S.Ct. 240, 107 L.Ed.2d 191 (1989); *Pearson v. City of Grand Blanc,* 961 F.2d 1211, 1221 (6th Cir.1992). While administrative law focuses on whether an agency's decision was supported by record evidence and abided by statutory criteria, substantive due process inquires into the conceivable outer limits of legitimate government power.