326 F.3d 569
 Gregory A. WILLIAMS; Virgil Hugh Reaves, Plaintiffs-Appellees,
v.
Ronald E. HANSEN, individually and in his official capacity as Police Chief, Defendant-Appellant, and
The City of Fayetteville; Roger Stancil, individually and in his official capacity as City Manager; John Smith, individually and in his then official capacity as City Manager; Ron Robun, individually and in his official capacity as City Manager; Bradley Chandler, individually and in his official capacity as a City Police Officer; Richard Bryant, individually and in his official capacity as a City Police Officer; Katherine Guilette, individually and in her official capacity as a City Police Officer; Steve McIntosh, individually and in his official capacity as a City Police Officer; The Fayetteville City Council; Sherry Sparks, individually and in her official capacity as a City Police Officer, Defendants.
The National Association of Police Organizations, Incorporated; National Association for the Advancement of Colored People, Fayetteville, North Carolina Branch, Amici Supporting Appellee.
 No. 02-1573.
 United States Court of Appeals, Fourth Circuit.
 Argued: January 21, 2003.
 Decided: April 22, 2003.
 
 COPYRIGHT MATERIAL OMITTED ARGUED: Steven Craig Lawrence, Anderson, Johnson, Lawrence, Butler & Bock, L.L.P., Fayetteville, North Carolina, for Appellant. James Harvestus Locus, Jr., Fayetteville, North Carolina, for Appellees. Joseph Michael McGuinness, The McGuinness Law Firm, Elizabethtown, North Carolina, for Amicus Curiae Police. ON BRIEF: William J. Johnson, National Association of Police Organizations, Inc., Washington, D.C., for Amicus Curiae Police. Dennis Courtland Hayes, Hannibal G. Williams II Kemerer, Baltimore, Maryland, for Amicus Curiae NAACP.
 Before KING, Circuit Judge, HAMILTON, Senior Circuit Judge, and GREENBERG, Senior Circuit Judge of the United States Court of Appeals for the Third Circuit, sitting by designation.
 Reversed and remanded by published opinion. Senior Judge GREENBERG wrote the opinion, in which Senior Judge HAMILTON joined. Judge KING wrote a dissenting opinion.
 OPINION
 GREENBERG, Senior Circuit Judge:
 
 I. INTRODUCTION
 
 1
 This matter comes on before this court on defendant Ronald E. Hansen's appeal from an order entered in the district court on May 15, 2002, to the extent that the order denied Hansen's motion for summary judgment on the basis of qualified immunity on claims against him by plaintiffs Gregory A. Williams and Virgil Hugh Reaves under 42 U.S.C. § 1983. Plaintiffs predicated their section 1983 actions insofar as implicated on this appeal on Hansen's alleged violation of the Equal Protection Clause of the Fourteenth Amendment.[1] The district court decided this case in a comprehensive opinion setting forth the background of this case. Williams v. Fayetteville, 5:99-CV-449-BR(2) (E.D.N.C. May 13, 2002).
 
 
 2
 We describe the facts less expansively as the issues before us are narrower. Williams and Reaves are black men who served as police officers employed by the Fayetteville, North Carolina, police department during the time relevant to this appeal. It appears that there have been racial problems within the Fayetteville police department for in 1974 Fayetteville settled a discrimination action brought against it by agreeing to increase the opportunities of black officers for better training and assignments and for promotions. The parties to that litigation memorialized their settlement in a consent decree that still was in effect at the time of the events leading directly to this action. The decree, however, was terminated in 1997.
 
 
 3
 In February 1996, in response to renewed complaints of racial discrimination against blacks in the police department, Hansen, then the Fayetteville chief of police, directed two high ranking black police officers, Major George Moyd and Captain Robert Shambley, to interview all of Fayetteville's black police officers to determine whether any had experienced racial discrimination or whether they had information regarding discrimination against blacks. At that time, however, Hansen did not direct that Moyd or Shambley or anyone else question white officers as to whether they had information regarding discrimination against blacks. Hansen further directed that Lt. Richard Bryant, chief of the department's Office of Professional Standards ("OPS"), was to interview any black officer who had perceived discrimination so that the complaints could be investigated.
 
 
 4
 In accordance with Hansen's direction, Moyd and Shambley interviewed all 68 black police officers in the department, Shambley interviewing Reaves and Moyd interviewing Williams. Both Reaves and Williams reported that there had been discrimination within the department and, in all, 17 officers did so. Williams and Reaves charge that the subsequent investigation of the reports of discrimination was nothing more than an effort to discredit the officers who had complained of discrimination and an attempt to determine the membership in a group of black officers called Officers for Equity that opposed racial discrimination in the police department.[2] Hansen, not surprisingly, disagrees with these allegations but, as will be seen, this dispute of fact does not preclude us from deciding the legal issues posed on this appeal.
 
 
 5
 Even though this action involves other claims and defendants in addition to Hansen, on this appeal we deal only with plaintiffs' allegations that Hansen violated their rights to equal protection of the laws by causing Moyd and Shambley to interview only the 68 black officers and not the more numerous several hundred white officers. Hansen, in moving for summary judgment on the basis of qualified immunity, contended in the district court and contends here that his decision to require interviews of black officers with respect to racial discrimination was lawful and, in any event, did not violate clearly established constitutional rights of which a reasonable person would have known. Thus, in his view, he is entitled to summary judgment on the basis of qualified immunity on plaintiffs' section 1983 equal protection claims and the district court erred in denying him that relief.
 
 
 6
 The district court rejected Hansen's immunity defense for the following reasons. First, it cited and quoted Shaw v. Reno, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), to demonstrate the Supreme Court's disapproval of racial classifications, quoting the portion of the opinion holding that "state legislation that expressly distinguishes among citizens because of their race [must] be narrowly tailored to further a compelling governmental interest." Id. at 643, 113 S.Ct. 2816. The district court then indicated that this principle has led courts "to conclude that intentional racial harassment of a public employee by a supervisor constitutes race discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment and is also actionable under [42 U.S.C] § 1983." Slip op. at 77.
 
 
 7
 The district court then stated that Hansen, when investigating racial discrimination within the police department, "in electing to interview only the black officers... effectuated a racial classification that immediately and ultimately subjected plaintiffs to unequal treatment." Id. The court indicated that it was not determinative that the case did not involve a statutory classification for in Sylvia Development Corp. v. Calvert County, 48 F.3d 810, 818 (4th Cir.1995) (emphasis in original), we stated that the "Equal Protection Clause limits all state action, prohibiting any state from denying a person equal protection through the enactment, administration, or enforcement of its laws and regulations." Id. The district court then said that inasmuch as "Hansen's investigation was explicitly limited to black officers, a suspect class, the court must apply strict scrutiny" in considering the investigation's legality. Id. Thus, the district court stated that "Hansen must show that the investigation was narrowly tailored to serve a compelling state interest," citing Shaw v. Hunt, 517 U.S. 899, 908, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996). Id. at 77-78.
 
 
 8
 The district court held that even assuming that the stated purpose for interviewing and investigating only the black officers, i.e., to determine if there was racial discrimination in the department, was its actual purpose and was compelling:
 
 
 9
 The court cannot conclude that the means chosen to effectuate the stated purpose were narrowly tailored. It was clearly overinclusive in that it subjected to investigation black officers who did not feel that discrimination or retaliation existed in the Department and underinclusive in that it did not take into account the perceptions of white officers regarding racial discrimination in the Department. There were certainly other, more narrowly tailored, non race-based methods that the Department could have employed to accomplish its stated purpose.
 
 
 10
 Id. at 78. The court, however, did not indicate what these alternative methods were.
 
 
 11
 Finally, after having concluded that Hansen's conduct violated the Equal Protection Clause, the court held that he was not entitled to qualified immunity for the following reasons:
 
 
 12
 The court also concludes that plaintiffs' right to equal protection of the laws protecting them from being subjected to coercive state conduct solely on the basis of their race was clearly established in February 1996. See Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race.") The court also concludes that a reasonable person in Chief Hansen's position would have known that his conduct would violate that right. Accordingly, the court concludes that defendant Ronald Hansen is not entitled to qualified immunity and thus is not entitled to summary judgment on plaintiffs' § 1983 claims that his conduct violated their right to the equal protection of the laws.
 
 
 13
 Id. at 78-79. Hansen then appealed.
 
 II. JURISDICTION AND STANDARD OF REVIEW
 
 14
 The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and we have jurisdiction under 28 U.S.C. § 1291 through application of the collateral order doctrine. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). We exercise de novo review on this appeal. See Rogers v. Pendleton, 249 F.3d 279, 285 (4th Cir.2001); Sylvia Dev. Co., 48 F.3d at 817.[3]
 
 III. DISCUSSION
 
 15
 On this appeal Hansen contends that he is entitled to qualified immunity on plaintiffs' claims and thus the district court erred in denying his motion for summary judgment.[4] Initially in considering this contention we determine whether plaintiffs have alleged facts setting forth valid claims for a deprivation of a constitutional right. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); County of Sacramento v. Lewis, 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Then, if plaintiffs' equal protection claims survive this threshold review, we must determine whether the right plaintiffs advance was clearly established at the time of its alleged violation so that a reasonable person would have known of the right. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In this second inquiry the appropriate consideration is whether a reasonable officer could have believed that his conduct was lawful. See Wilson v. Layne, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); Rogers v. Pendleton, 249 F.3d at 288. If so then the officer enjoys immunity.
 
 
 16
 The operative facts here are quite clear. Hansen directed that Moyd and Shambley interview all of the black officers regarding their experiences or perceptions of racial discrimination within the department but did not direct that they or anyone else interview any white officers for information they might have relevant to the inquiry. While plaintiffs question the bona fides of Hansen's stated motives for pursuing the inquiry, i.e., that he would not tolerate discrimination within the department and desired to take any necessary corrective measures, the interviews did reveal the position that the black officers articulated on the racial discrimination issue.
 
 
 17
 The existence of a factual dispute regarding Hansen's motives does not preclude us from entertaining this appeal even though we cannot resolve disputes of fact. What we can and will do is answer the abstract question of law as to whether when there are allegations that a discrete racial group has been subjected to discrimination, it is lawful to conduct interviews in the first instance only of members of that group to ascertain their experiences and perceptions with respect to the discrimination. See Behrens v. Pelletier, 516 U.S. 299, 312-13, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996).
 
 
 18
 We also emphasize that it is important to recognize that we do not deal with Hansen's alleged misuse of the information he obtained from the interviews any more than we resolve disputes regarding his motives in directing that Moyd and Shambley interview the black officers. Thus, while plaintiffs contend in their brief that "[t]aking the evidence in the best light for [them] Hansen used the Shambley/Moyd interviews and the subsequent Black-only investigations in order to determine the membership of the `Officers for Equity,'" Appellees' Br. at 53-54, we agree with the district court to the extent that it held that plaintiffs' "claim that Chief Hansen violated their equal protection rights by further targeting those African-American officers who identified discriminatory practices within the Department ... does not state a cognizable equal protection claim." Slip op. at 76.
 
 
 19
 Accordingly, even though plaintiffs in their brief complain that there was retaliation against them, in deciding this appeal we are not concerned with that contention. In this regard, we note that plaintiffs have brought complaints based on retaliation in violation of Title VII of the Civil Rights Act of 1964 against the City of Fayetteville and the Fayetteville City Council by reason of the ultimate termination of their employment and what they assert in their second amended complaints was the "creation of a hostile working environment based upon race and retaliation." App. at 319, 331. These charges still are pending in the district court.
 
 
 20
 As we have indicated, the district court applied strict scrutiny in considering the classification and found that the means to ascertain whether there was discrimination was overinclusive because "it subjected to investigation black officers who did not feel that discrimination or retaliation existed in the Department and underinclusive in that it did not take into account the perceptions of white officers...." Slip op. at 78. That analysis was flawed and was internally inconsistent. Clearly, until such time as the black officers were questioned Hansen could not know which officers felt that there was a discrimination problem. Thus, to the extent that the classification he made included all the black officers it hardly could be overinclusive. Furthermore, unless Hansen had every white officer interviewed he could not know which ones, if any, shared that belief. But if he had had all the white officers interviewed then the classification under the district court's analysis would have been overinclusive.[5] In any event, we will not hold that a public official attempting to ascertain whether there is discrimination in his department may not initiate the process by seeking the views of members of the group which allegedly is the target of discrimination.
 
 
 21
 In reviewing Hansen's actions we recognize "that all racial classifications, imposed by whatever federal, state, or local government actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).
 
 
 22
 Hansen nevertheless argues that this case does not implicate the equal protection principles set forth in Adarand and, accordingly, his decision to interview only black officers should not be reviewed on a strict scrutiny basis "as the interviews were not race classifying guidelines, procedures or laws, but rather the most focused initial step taken by [him] to attempt to identify potential areas of perceived or real discrimination in the Department." Appellant's Br. at 12-13. We agree with this argument. After all, we indicated in Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir.2001), that "[t]o succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny."
 
 
 23
 In this case the black and white officers were not similarly situated with respect to the object of Hansen's inquiry as the former but not the latter were allegedly subject to discrimination. Thus, Hansen could treat the groups differently in directing that officers be interviewed without violating the Equal Protection Clause. Indeed, taking into account the applicable principles that Morrison explained, it is evident that plaintiffs have conceded away their position on this appeal by stating in their brief that "[t]o prove a violation of the Equal Protection Clause, the forecasted evidence demonstrated that [they] were treated differently from similarly situated white officers." Appellees' Br. at 43 (citing In re Long Term Admin. Segregation of Inmates, 174 F.3d 464, 471 (4th Cir.1999)). The fact is that the black and white officers for the purposes of the matter into which Hansen was inquiring, i.e., was there discrimination against black officers in his department, were not similarly situated. Thus, plaintiffs do not set forth valid claims for the deprivation of a constitutional right and their case fails at the outset.
 
 
 24
 We hasten to add, however, that our opinion should not be overread. Certainly, for most purposes officers in a police department must be regarded as similarly situated regardless of their race. Thus, in matters such as assignments, promotions, and salary levels a race-based distinction among officers would be subject to strict scrutiny in an equal protection analysis.[6] But it would be illogical to hold that officers in one racial group are similarly situated in an inquiry into whether there is discrimination against members of their racial group as compared to officers not within the group.
 
 
 25
 Even though plaintiffs' case has failed at its outset, we point out that Hansen made a completely reasonable classification that would survive a strict scrutiny analysis if it were applicable. He had information that some black officers believed that there was discrimination and he directed that the potential victims of the discrimination be interviewed to ascertain their knowledge of the situation. Surely, this approach was narrowly tailored to address the problem at hand. While the district court indicated that there "were certainly other, more narrowly tailored, non race-based methods that the Department could have employed to accomplish its stated purpose," slip op. at 78, it did not specify those methods.
 
 
 26
 Significantly, in their brief plaintiffs make a suggestion as to what they say "perhaps" would have been a more narrowly tailored approach to the interviews:
 
 
 27
 One reasonable alternative to conducting the all Black investigations as [Hansen] did would have been for him to have compiled the same data that the City was then mandated to collect under the terms of the consent decree. The collection of this data would have provided him with the status regarding promotions, assignment and other pertinent data as to all the officers employed with the City and perhaps been a more narrowly tailored approach to the one taken by Appellant-Defendant Hansen.
 
 
 28
 Appellees' Br. at 48.
 
 
 29
 The problem with plaintiffs' approach is obvious. While Hansen undoubtedly could have made a statistical analysis of the race of officers promoted and of officers in particular assignments, that analysis would not have addressed the claimed acts of discrimination predicated on what plaintiffs charge was the hostile racial environment within the department. For example, Reaves complains of having "experienced great criticism from his supervisors and white co-workers" and having been suspended and reduced in rank. Appellees' Br. at 19. In his view, "the discipline and his treatment were discriminatory, [though] he elected not to appeal the suspension." Id. Reaves also complains that "white officers had told lies on him and discouraged trainees from working with him which contributed to his suspension in December 1995." Id. at 21. Moreover, "he felt that Black officers were not viewed as intelligent by white officers nor were Black officers given opportunities to make decisions as white officers." Id. at 21. The statistical analysis that plaintiffs propose could not reveal that an officer had perceptions of this kind.
 
 
 30
 Amicus curiae National Association of Police Organizations also makes suggestions as to how Hansen could have obtained the information he sought:
 
 
 31
 1) Conduct a traditional departmental survey of all officers in written form, with or without follow up interviews; and/or
 
 
 32
 2) Conduct structured interrogations of all officers; and/or
 
 
 33
 3) Conduct random interrogations of officers; and/or
 
 
 34
 4) Retain an independent law enforcement consultant experienced in addressing issues of suspect class discrimination.
 
 
 35
 Amicus Br. at 13-14.
 
 
 36
 Conceivably such methods would have uncovered information regarding discrimination. But obviously there are problems with the Association's suggestions. Written questions and answers may not be an accurate substitute for face to face questioning as they do not afford an opportunity for probing immediate follow-up questions. "Structured interrogations of all officers" would have been a far larger undertaking than simply questioning the potential victims of the discrimination and, in expanding the initial inquiries beyond the class of the alleged victims, would have imposed a larger administrative burden on the department. Random interrogations might have missed black officers subject to discrimination. Finally, employing an independent consultant would have passed to the consultant the choice as to how to proceed similar to that Hansen faced himself. We also point out that some of the Association's suggestions are less narrowly tailored than that Hansen adopted. In any event, we see no reason why the police department should not have been able to investigate its own affairs and address its own problems, when, as here, it did so by making narrowly focused inquiries. Courts should not micro-manage police departments.
 
 
 37
 It is also important to recognize that Hansen did not preclude the questioning of white officers in a discrimination investigation. At a grievance hearing for Reaves, which is part of the record on this appeal, when asked why he did not have Moyd and Shambley speak to white officers, Hansen explained:
 
 
 38
 It's the black officers were the ones that were talking about discrimination and racism now. That was an inquiry; not investigation. Once the inquiry is done, if the investigation point — wherever it pointed, then the Office of Professional Standards is charged with going after wherever it pointed.
 
 
 39
 App. at 94. Thus, Hansen regarded the interviews as merely making an opening inquiry.
 
 
 40
 In determining whether the classification that Hansen drew could have survived a strict scrutiny analysis, if applicable, it is useful to consider the stopping of motorists on a racial basis. Everyone would agree that police officers should not stop motorists merely on the basis of their race. But if police officers are advised that a perpetrator of a particular race is fleeing from the scene of a crime, surely it would be reasonable if they stopped only motorists of that race at a road block in an effort to apprehend the criminal. Similarly, a police department lawfully might make a racial classification when picking officers to infiltrate a criminal enterprise depending on the racial make-up of the members of the enterprise.
 
 
 41
 Hansen was confronted with allegations that blacks were subject to discrimination and he reasonably caused the possible victims of the discrimination to be interviewed to ascertain their views as to whether the allegations were accurate. We are satisfied that a classification distinguishing between possible victims and other officers for purposes of the interviews could survive a strict scrutiny analysis as the classification was narrowly tailored and the police department had a compelling interest in knowing whether there was discrimination in the department. Therefore, even if plaintiffs' claims charged that officers who in fact were similarly situated were treated differently on the basis of their race, and they do not because the black and white officers were not similarly situated, the alleged disparate treatment would survive a strict scrutiny analysis. Thus, for this additional reason, plaintiffs' case does not survive the first prong of a Saucier/Lewis analysis. Accordingly, we are obliged to reverse the district court's order denying Hansen summary judgment.
 
 
 42
 As we indicated above, if we had determined that the facts the plaintiffs alleged set forth valid claims for a deprivation of a constitutional right, which we do not, we would have been obliged to determine whether the right involved was clearly established at the time involved so that a reasonable person would have known of the right. But inasmuch as we have found that plaintiffs have not advanced valid claims we could stop this opinion at this point. Yet we will address the second aspect of a Saucier/Lewis analysis as our conclusion on it supplies an alternative basis for our decision.
 
 
 43
 The short answer to this inquiry is obvious. Certainly if judges of United States Courts of Appeals are of the view that plaintiffs are advancing a "right" that did not exist when allegedly infringed (and still does not exist) then the right could not have been clearly established at the time infringed. Indeed, it would be remarkable to hold that a reasonable person, here a chief of police, should have known more constitutional law than United States Circuit Judges and that because he did not he should be subject to the imposition of monetary damages.
 
 
 44
 That said, we nevertheless will consider cases dealing with race-based classifications in determining if the right plaintiffs advance was clearly established. We start quite naturally with Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), as the case instructs us on how to approach the inquiry. In that case the Court indicated that a government official performing a discretionary function, as was Hansen, was entitled to qualified immunity in a civil rights action "as long as [his] actions could reasonably have been thought consistent with the rights [he is] alleged to have violated." Id. at 638, 107 S.Ct. 3034. Thus, the Court indicated, quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), that "qualified immunity protects `all but the plainly incompetent or those who knowingly violate the law.'" The assessment of an officer's actions turns on its "`objective legal reasonableness.'" Id. at 639, 107 S.Ct. 3034 (quoting Harlow, 457 U.S. at 819, 102 S.Ct. 2727).
 
 
 45
 Anderson then goes on to state the following:
 
 
 46
 The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right.
 
 
 47
 Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. Harlow would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." ... It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.
 
 
 48
 Id. at 639-40, 107 S.Ct. 3034 (omitting footnote and certain citations). See also Cromer v. Brown, 88 F.3d 1315, 1325 (4th Cir.1996). This cautionary language in Anderson is particularly important in a case of this kind in which plaintiffs challenge an administrative race-based classification as such classifications in other contexts may be violative of the Equal Protection Clause.
 
 
 49
 In fact, however, plaintiffs do not refer to any case that should have led Hansen to conclude that a race-based classification in which in the first instance only the potential victims of discrimination were questioned about their experiences and perceptions is unlawful. Significantly, Hansen threw down the gauntlet to plaintiffs on this point when he stated in his opening brief that he "has been unable to locate any appellate cases similar to the trial court's basis for denying him qualified immunity...." Appellant's Br. at 23. He then quite reasonably argues that the absence of cases "is an indicator that his proactive decision to interview black officers can certainly not be said to have violated `clearly established law' as of February 1996." Id.
 
 
 50
 In answering, plaintiffs do not supply particularized case law to support their equal protection claims. Instead, they make the non-germane argument that Hansen misused the interviews to ascertain the membership in Officers for Equity and then remind us that in Podberesky v. Kirwan, 38 F.3d 147, 152 (4th Cir.1994), a case dealing with a race-based scholarship program, we indicated that "[g]overnment institutions that choose to employ racial classifications face `a presumption that [such a] choice cannot be sustained.'" Appellees Br. at 55. We do not doubt that plaintiffs' citation of Podberesky is apt but that case merely indicated in a completely different context that there is a presumption that a race-based classification cannot be sustained. Here, however, that presumption never came into being as the black and white officers were not similarly situated. Moreover, if the presumption had been applicable then Hansen would have rebutted it even if his conduct was examined on a strict scrutiny basis.
 
 
 51
 Plaintiffs are supported on this appeal by a brief filed by amicus curiae National Association for the Advancement of Colored People ("NAACP") but it is of no help to plaintiffs as it, too, does not point to any case germane to this case in a "particularized" sense. See Anderson, 483 U.S. at 640, 107 S.Ct. 3034. Rather, it tells us in a generalized way that strict scrutiny is required and charges that Hansen made a classification that was not narrowly tailored and was not reasonably related to a compelling state interest.
 
 
 52
 The NAACP complains that Hansen "asserted no legitimate rationale for urging only senior black officers to investigate exclusively African American police officers... regarding allegations of race discrimination in the Department." Br. at 15 (emphasis in original). This statement, however, simply is untrue. Hansen explained at Reaves' grievance hearing that "I felt that I did not want to have [a] perception during this inquiry that black officers would feel uncomfortable or unwilling to tell about racial discrimination if, in fact, it did exist. So that was my purpose of getting the two senior black officers." App. at 94. Furthermore, neither Moyd nor Shambley is a plaintiff in this action and the equal protection classification of which plaintiffs have standing to complain relates to the persons questioned and not the selection of the persons to ask the questions.
 
 
 53
 Similarly the Police Organization's brief does not cite any case germane to this appeal in a particularized sense demonstrating that the "right" plaintiffs advance was clearly established so that Hansen should have been aware of it. Indeed, its brief makes clear that its argument challenges conduct beyond the circumstance that only black officers initially were questioned as its summary of its argument starts as follows:
 
 
 54
 The District Court correctly denied qualified immunity to Defendant Hansen because of his intentional discriminatory practices including but not limited to racially based interrogations and retaliatory tactics against African American police officers in the Fayetteville Police Department. The totality of Defendant Hansen's conduct constitutes a form of internal racial profiling, segregating black officers for disparate treatment by interrogations and further investigations if they articulate perceptions of discrimination. This tragic case involves a web of overt discrimination and retaliation.
 
 
 55
 Br. at 6. The brief later argues that because cases are not completely alike, "the requirement of a clearly established right is not overly stringent." Br. at 11 (citing Edwards v. City of Goldsboro, 178 F.3d 231, 250-51 (4th Cir.1995)).
 
 
 56
 This amicus curiae brief misses the point. We are not concerned on this appeal with the "totality" of Hansen's conduct. Rather, we reiterate, at the risk that a reader of this opinion may think that we are unduly repetitious, that we are dealing with an alleged equal protection violation predicated on the circumstance that Hansen caused only black officers to be initially interviewed with respect to possible discrimination.
 
 
 57
 In applying Anderson we recognize that cases need not be identical for a public officer to be charged that on the basis of precedent he should have recognized that his conduct violated a right that was clearly established. See, e.g., Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002) (cases with materially similar facts can provide especially strong support for a conclusion that the law was clearly established); Finn v. New Mexico, 249 F.3d 1241, 1250 (10th Cir.2001); Ulichny v. Merton Comty. Sch. Dist., 249 F.3d 686, 706 (7th Cir.2001). But still it would be a remarkable extension of equal protection principles to hold that the very act of questioning the members of a racial group as to whether they perceived discrimination against the members of that group was in itself unlawful. We are not aware of any case from the Supreme Court or this court that comes close to making such a holding and, in fact, the plaintiffs and the amici curiae do not supply us with any from other jurisdictions.
 
 
 58
 In the circumstances, we cannot reasonably hold that Hansen objectively should have known that his conduct was unlawful when he directed Moyd and Shambley to question only black officers about discrimination against blacks. A reasonable person in Hansen's position was entitled to obtain his legal guidance from law books rather than a crystal ball. Thus, the equal protection right that plaintiffs advance was not clearly established when Hansen directed that the black officers be interviewed and he is entitled to summary judgment on this ground, which is in addition to those we already explicated, granting him qualified immunity from plaintiffs' equal protection claims.
 
 IV. CONCLUSION
 
 59
 For the foregoing reasons we reverse the order of May 15, 2002, to the extent that it denied Hansen's motion for summary judgment on the basis of qualified immunity on plaintiffs' equal protection claims. We remand the matter to the district court to enter summary judgment in favor of Hansen and for further proceedings on the remaining issues in this case.
 
 
 REVERSED AND REMANDED
 
 
 
 Notes:
 
 
 [1]
 Plaintiffs also made other section 1983 claims as well as claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000eet seq., and state law that are not before us on this appeal.
 
 
 [2]
 We note that there is some discrepancy over nomenclature in this case as the parties and the district court variously characterize the interviews as inquiries or an investigation. Our outcome is not dependent on such differences as we are concerned with what happened rather than the parties' characterization of the events
 
 
 [3]
 Inasmuch as plaintiffs stated supplemental claims under state law the district court also exercised jurisdiction under 28 U.S.C. § 1367
 
 
 [4]
 Hansen also asserts that plaintiffs' complaints in a pleading sense did not set forth claims for equal protection violations and that, in any event, plaintiffs do not have standing to pursue these claims. We find these arguments to be without merit, and reject them summarily without further substantive discussion. We do point out, however, that we have jurisdiction to consider these arguments as the pleading issue is within our pendent appellate jurisdiction,see Akers v. Caperton, 998 F.2d 220, 223-24 (4th Cir.1993), and we would be obliged to take notice if plaintiffs lacked standing as the absence of standing would be a jurisdictional defect. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).
 
 
 [5]
 We realize that there may be officers in other racial groups in Fayetteville,i.e., Hispanic and Asian, but we do not find it necessary to mention them separately as the parties do not focus on them and their presence has no bearing on our analysis.
 
 
 [6]
 In fact, there is an assertion in this case that the department discriminates against black officers in assignments in that they are relegated to narcotics and patrol duties. We, of course, have no way of knowing whether this assertion is accurate but if it is it should be understood that we offer no opinion on the legality of the assignments and our opinion cannot be understood as validating them
 KING, Circuit Judge, dissenting:
 The majority today concludes that, consistent with the precepts of equal protection, a chief of police who has received complaints of racial discrimination within his department may select all and only the alleged victims of the discrimination — the department's African-American officers — as targets of an investigation into the complaints. Even if the selection of the African-American officers under these circumstances did not constitute an express racial classification, Chief Hansen nonetheless should not be awarded qualified immunity: Williams and Reaves have alleged specific facts indicating that Hansen's facially neutral classification was both injurious and motivated by discriminatory animus. Under clearly established principles of equal protection, these allegations, if proven, set forth valid claims for the deprivation of a constitutional right. Thus, in my judgment, the district court correctly held that Hansen had not carried his burden of establishing his entitlement to qualified immunity, and it properly denied his motion for summary judgment. With all respect to my distinguished colleagues in the majority, I dissent.
 I.
 In concluding that Hansen is entitled to summary judgment on the basis of qualified immunity, the panel majority engages in a traditional Adarand analysis, assessing whether Hansen employed an expressly discriminatory classification. Its opinion reasons that "the black and white officers for the purposes of that matter into which Hansen was inquiring, i.e., was there discrimination against black officers in his department, were not similarly situated." Supra at 576. As a result, "Hanson could treat the groups differently in directing that officers be interviewed without violating the Equal Protection Clause," and Williams and Reaves "do not set forth valid claims for the deprivation of a constitutional right." Supra at 576. According to the majority, there was no express racial classification because Hansen selected not all and only the African-Americans, but rather all and only the alleged victims of intradepartmental discrimination. That those alleged victims were all African American officers did not, on this reasoning, render the classification expressly discriminatory.
 The majority opinion goes on to note that "even if plaintiffs' claims charged that officers who in fact were similarly situated were treated differently on the basis of their race, ... the alleged disparate treatment would survive a strict scrutiny analysis." Supra at 578. Finally, it holds in the alternative that "the equal protection right that plaintiffs advance was not clearly established when Hansen directed that the black officers be interviewed [since] it would be a remarkable extension of equal protection principles to hold that the very act of questioning the members of a racial group as to whether they perceived discrimination against the members of that group was in itself unlawful." Supra at 581.
 The majority's analysis, while perhaps correct on its own terms, leaves unexplored an important aspect of the officers' allegations against Hansen. As its opinion acknowledges, the "plaintiffs question the bona fides of Hansen's stated motive for pursuing the inquiry, i.e., that he would not tolerate discrimination within the department and desired to take any necessary corrective measures." However, the panel majority dismisses the issue of intent out of hand, stating that "[t]he existence of a factual dispute regarding Hansen's motives does not preclude us from entertaining this appeal even though we cannot resolve disputes of fact." Supra at 574-575.
 In my assessment, the dispute of fact as to Hansen's motives in selecting all and only the African-American officers in his department as targets of his investigation cannot so easily be brushed aside. The plaintiffs may fairly be understood to allege that, even if Hansen employed a facially neutral policy in responding to complaints of discrimination by interviewing all and only those who were within the class of purported victims, that policy both was motivated by discriminatory animus toward African-Americans and adversely effected this group. Thus, even if the majority is correct to conclude that Hansen's selection of interviewees was facially neutral, it remains to be determined whether he is entitled to the protection of qualified immunity.
 II.
 As the majority opinion acknowledges, supra at 574, Williams and Reaves were entitled to prevail against Hansen's motion for summary judgment only if: (1) they had alleged facts setting forth valid claims for the deprivation of a constitutional right, Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); and (2) the right was clearly established at the time of the alleged violation such that a reasonable person would have known of it, Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
 Taking the facts, as we must, in the light most favorable to the parties asserting the injury, Williams and Reaves have alleged the violation of a clearly established constitutional right. Twenty-six years ago, the Supreme Court made clear that a facially neutral administrative action that disparately impacts members of a particular racial group will violate the Equal Protection Clause if the plaintiff demonstrates that the action was motivated, at least in part, by an "invidiously discriminatory" intent. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (remanding equal protection challenge to local authorities' refusal to rezone land to permit racially integrated low-income housing for inquiry into discriminatory intent). The protection against invidious discrimination that hides behind facially neutral policies has become only more firmly entrenched. See, e.g., Shaw v. Reno, 509 U.S. 630, 644, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993); Hunter v. Underwood, 471 U.S. 222, 233, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985); Rogers v. Lodge, 458 U.S. 613, 618, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); Smith v. Town of Clarkton, 682 F.2d 1055, 1066 (4th Cir.1982); see also Sylvia Dev. Corp. v. Calvert County, 48 F.3d 810, 819 (4th Cir.1995). Because the plaintiffs have made out valid claims for the denial of a clearly established constitutional right, the district court correctly denied Hansen's motion for summary judgment on the basis of qualified immunity.
 A.
 The Fourteenth Amendment to the Constitution declares that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race. See id. at 439-40, 105 S.Ct. 3249; Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 471 (4th Cir.1999); Sylvia Dev. Corp., 48 F.3d 810, 818-19.
 There are several ways for a plaintiff to make out a valid claim of unconstitutional discrimination. A plaintiff can point to a law or policy that expressly classifies persons on the basis of race. See Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 213, 227-29, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Or, a plaintiff can identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner. See Yick Wo v. Hopkins, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). A plaintiff can also allege that a facially neutral statute or policy that is neutrally applied nonetheless has an adverse effect on a protected group, and that the adoption of the statute or policy was motivated by discriminatory animus. See Arlington Heights, 429 U.S. at 264-65, 97 S.Ct. 555; see also Hunter, 471 U.S. at 233, 105 S.Ct. 1916 (holding that Alabama constitutional provision, which mandated disenfranchisement of those convicted of crimes of moral turpitude, violated equal protection, because provision was "motivated by a desire to discriminate against blacks on account of race").
 Regardless of which of these three forms of intentional discrimination is alleged, the Equal Protection Clause "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." Arlington Heights, 429 U.S. at 265, 97 S.Ct. 555 (emphasis added). Rather, a plaintiff need only establish that racial animus was one of several factors that, taken together, moved the decision-maker to act as he did. See Farm Labor Org. Comm. v. Ohio State Highway Patrol, 308 F.3d 523, 539 (6th Cir.2002) (holding that state trooper's possession of some race-neutral basis for initiating investigation was insufficient, standing alone, to entitle trooper to qualified immunity from liability on plaintiff's equal protection claims if plaintiff could demonstrate that trooper was partly motivated by discriminatory purpose).
 Though a valid claim for a violation of equal protection need not allege discrimination as the defendant's sole motive, it must allege the requisite discriminatory intent with more than mere conclusory assertions. Thus, to state valid claims for violation of equal protection and thereby to survive Hansen's motion for summary judgment on the basis of qualified immunity, Williams and Reaves must put forward "specific, non-conclusory factual allegations that establish improper motive." Trulock v. Freeh, 275 F.3d 391, 405 (4th Cir.2001) (quoting Crawford-El v. Britton, 523 U.S. 574, 598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (discussing plaintiff's pleading burden in face of defendant's qualified-immunity-based summary judgment motion, in First Amendment retaliatory termination context)).
 Even after a plaintiff has come forward with the requisite specific, non-conclusory factual allegations of an invidious discriminatory intent, determining whether official action was motivated by intentional discrimination remains "a sensitive inquiry." Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555. In delving in the minds of state officials, a court may look to "such circumstantial and direct evidence of intent as may be available." Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555. "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another." Washington, 426 U.S. at 242, 96 S.Ct. 2040. The Supreme Court has since provided further guidance regarding this "totality of the relevant facts" inquiry. First, and importantly, the Court has recognized that the direct impact of the challenged official action is frequently probative of why the action was taken, since people "usually intend the natural consequences of their actions." Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 487, 117 S.Ct. 1491, 137 L.Ed.2d 730 (1997) (citing Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555). Other relevant considerations include: (1) the historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (2) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (3) contemporary statements by the decisionmaker. Arlington Heights, 429 U.S. at 266-68, 97 S.Ct. 555; see also Sylvia Dev. Corp., 48 F.3d at 819 (applying Arlington Heights to analyze intent in equal protection context); Talbert v. City of Richmond, 648 F.2d 925, 929 (4th Cir.1981) (same).
 B.
 To prevail on the merits of their equal protection claim, Williams and Reaves need only prove at trial that Hansen's selection of the targets of his investigation was motivated in part by discriminatory intent.[1] And at this qualified immunity stage of the suit, it is necessary only that they allege facts from which a jury could conclude that a part of Hansen's motivation in selecting the targets of his investigation was discriminatory animus. Because they have made specific, non-conclusory factual allegations, which, when viewed together and taken as true, raise a reasonable inference that the investigations were prompted at least in part by an illegal motive, Williams and Reaves are entitled to a trial on the merits of their equal protection claim.
 The "important starting point" for assessing discriminatory intent under Arlington Heights is whether the challenged official action "bears more heavily on one race than another." Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555 (citing Washington, 426 U.S. at 242, 96 S.Ct. 2040). Hansen's purported policy of selecting for interviews only the alleged victims of intradepartmental discrimination bore not just more heavily on one race than another. By leading him to investigate all and only the African-American officers, Hansen's policy bore exclusively on one race. Thus, under the first Arlington Heights criterion, Hansen's decision to adopt the policy that he did strongly evinces a discriminatory intent.
 Additional factors that bear on our inquiry include "[t]he historical background of the decision," "[t]he specific sequence of events leading up [to] the challenged decision," and "contemporary statements by [decisionmakers]." Id. at 267-68, 97 S.Ct. 555. Under these factors, the plaintiffs have alleged specific facts that would support a finding that Hansen acted with discriminatory intent when he chose to direct his investigation at the victims of possible intradepartmental discrimination.
 Viewed in the light most favorable to the plaintiffs, both the historical and the immediate backgrounds of Hansen's investigation bolster their allegations of discriminatory intent. As an historical matter, in February 1996, when the challenged investigation occurred, the City of Fayetteville was under a longstanding consent order to eliminate racial discrimination within its workforce. In the weeks and months preceding Hansen's decision to conduct his investigation, a number of African-American police officers had become increasingly concerned that the Police Department was taking deliberate steps to impede the progress of African-American officers. To address these concerns, the officers had formed a group called "Officers for Equality." In forming this group, the officers intended to oppose acts of discrimination regarding assignments, promotions, and training. The members of the group believed that the Department had deliberately failed to comply with the terms of the consent order, and they had contacted counsel to learn what legal action could be taken to force the City into compliance. Among the group's concerns was their belief that Hansen had pressured African-American officers, over their objections and with threat of termination, to prepare false written statements attesting to the Department's efforts to comply with the consent order, and asserting that the order was no longer necessary.
 In addition to these facts, which suggest both historical and immediate racial discrimination within the Police Department, the plaintiffs note several events contemporaneous with the investigation that is the subject of dispute. From these events, a jury could fairly infer that Hansen holds a general hostility toward the African-American officers and their concerns. Hansen learned of the group "Officers for Equality" over the weekend prior to his decision to initiate the challenged, African-Americans-only investigation. According to the plaintiffs, the questioning that occurred during the interviews was designed to uncover the identities of the members of the group. Furthermore, after requiring all of the African-American officers to participate in interviews regarding their perceptions of discrimination within the Department, Hansen ordered disciplinary action against those among them who were unable to furnish proof to substantiate the very perceptions that they had been required to disclose. Then, in a follow-up memo on the Moyd/Shambley interviews, Hansen instructed his senior staff not only to look for evidence to support the concerns expressed by some of the African-American officers during the interviews, but also to look for ways to "discredit" the officers' concerns.
 As the district court observed, while the purpose of the Hansen's investigation was "ostensibly to discern the existence or prevalence of discriminatory or racist practices or conduct in the Department," "[i]t seems clear from defendants' statement... that the Department was not intent on investigating the perceptions of discrimination but rather intent on investigating what the defendants involved considered `lies.'" Williams v. Fayetteville, Mem. Op., 5:99-CV-449-BR(2), at 22 n. 15 (E.D.N.C. May 13, 2002). The "tortuous machinations employed to transform descriptions of perceived discriminatory or retaliatory conduct into `lies,'" id., lend further credence to the plaintiffs' contention that Hansen ordered the African-Americans-only interviews with discriminatory intent.
 These facts, taken together and in the light most favorable to the plaintiffs, are more than adequate to support an inference that Hansen's facially neutral policy of directing his investigation at the purported victims of racial discrimination within the Department was motivated by invidious discriminatory animus. Having made the requisite specific, nonconclusory factual allegations in support of their equal protection claim, the question of motive becomes one for the jury. See Farm Labor Org. Comm., 308 F.3d at 539 (upholding denial of qualified immunity premised on district court's determination that plaintiffs had advanced sufficient evidence to support finding of discriminatory intent and holding that, once this initial burden of production is satisfied, "[t]he question of whether [an official's] allegedly discriminatory motive played a determinative role in the decision to investigate the plaintiffs... is a factual dispute best suited for resolution at trial"); cf. Koch v. Rugg, 221 F.3d 1283, 1297-98 (11th Cir.2000) (holding that court of appeals lacked jurisdiction over interlocutory appeal from denial of qualified immunity where defendants based their appeal solely on alleged lack of evidence to show racially discriminatory intent); Stella v. Kelley, 63 F.3d 71, 75 (1st Cir.1995) (upholding denial of qualified immunity on the ground that court of appeals "lack[s] the power to inquire into ... the fact-based question of what the evidence does (or does not) show concerning whether the [officials'] actions violated the asserted right — a question that depends, in this case, on the [officials'] motives"). Williams and Reaves have alleged specific facts from which it could be inferred that when Hansen selected all and only the African-Americans officers for his investigation, he was motivated at least in part by discriminatory animus.
 C.
 When Hansen instituted this investigation almost a quarter of a century after the Supreme Court rendered its decision in Arlington Heights, it was eminently well established that a facially neutral administrative action that is undertaken with an intent to discriminate against a particular racial group is forbidden by the Constitution. Accordingly, the district court did not err in denying Hansen qualified immunity from the plaintiffs' equal protection claims.
 The "clearly established" prong of the qualified immunity inquiry requires that "the contours of the right ... be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "In determining whether a right was clearly established at the time of the claimed violation, `courts in this circuit [ordinarily] need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose.'" Edwards v. City of Goldsboro, 178 F.3d 231, 251 (4th Cir.1999) (quoting Jean v. Collins, 155 F.3d 701, 709 (4th Cir.1998) (en banc)) (alteration in original).
 It is not essential that there exist a decided case that is on all fours with the facts at hand in order for public officials to be on fair notice that their conduct violates the Constitution. See Wilson v. Layne, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (holding that precise conduct need not have been previously held unlawful in order for qualified immunity to be forfeited); Edwards, 178 F.3d at 251 ("[T]he nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity."); see also Amaechi v. West, 237 F.3d 356, 362-63 (4th Cir.2001) (denying qualified immunity despite absence of factually similar precedent); McMillian v. Johnson, 88 F.3d 1554, 1565 (11th Cir.1996) (same). After all, "qualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations." Trulock v. Freeh, 275 F.3d 391, 405 (4th Cir.2001) (Michael, J., concurring).
 Under the Supreme Court's decision in Arlington Heights, Hansen had fair notice that a facially neutral yet discriminatorily motivated administrative action violates equal protection. Indeed, given the unbroken and wide-ranging line of equal protection decisions reaffirming and applying the Arlington Heights principle, it is difficult to imagine how the message might have been made clearer. See, e.g., Shaw, 509 U.S. at 644, 113 S.Ct. 2816 (applying Arlington Heights to analyze equal protection challenge to alleged racially discriminatory gerrymander of voting districts); Hunter, 471 U.S. at 233, 105 S.Ct. 1916 ("[Alabama's disenfranchisement of persons convicted of crimes involving moral turpitude] was motivated by a desire to discriminate against African-Americans on account of race and ... continues to this day to have that effect. As such, it violates equal protection under Arlington Heights."); Rogers v. Lodge, 458 U.S. 613, 618, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982) (applying Arlington Heights to evaluate equal protection challenge to alleged racially discriminatory vote dilution); Smith v. Town of Clarkton, 682 F.2d 1055, 1066 (4th Cir.1982) (applying Arlington Heights to analyze equal protection challenge to town officials' withdrawal of town from multi-municipality low-income housing authority, holding district court's finding of racially discriminatory intent not clearly erroneous, and affirming district court's conclusion that town officials violated equal protection); see also Sylvia Dev. Corp., 48 F.3d at 819-24 (applying Arlington Heights to analyze national-origin equal protection challenge to county officials' refusal to grant requested rezoning). Under these precedents, a reasonable person in Hansen's position could make no mistake that to adopt with discriminatory animus a facially neutral policy that subjected all and only the African-Americans in his Department to investigation, would be to violate the equal protection rights of the targeted officers.[2]
 D.
 As the Supreme Court has observed, the central purpose of the Equal Protection Clause "is to prevent the States from purposefully discriminating between individuals on the basis of race." Shaw, 509 U.S. at 642, 113 S.Ct. 2816 (citing Washington, 426 U.S. at 239, 96 S.Ct. 2040). Williams and Reaves have made out a claim for precisely this sort of purposeful, race-based discrimination, and they have supported that claim with specific factual allegations. Thus, because Hansen failed to meet his burden of proving that the plaintiffs asserted no valid claims for the violation of clearly established constitutional rights, Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980), I must part company with my distinguished colleagues in the majority.
 I respectfully dissent.
 Notes:
 
 
 [1]
 It should be noted that, if initiated for an illegal purpose, the investigation itself is actionable; the plaintiffs need prove no further adverse employment actionSee Hetzel v. County of Prince William, 89 F.3d 169, 171 (4th Cir.1996) (noting that internal affairs investigation itself constitutes "adverse employment action," depriving employee of a "valuable government benefit" under Huang v. Bd. of Governors, 902 F.2d 1134, 1140 (4th Cir.1990), and treating such investigation as actionable under § 1983); see also Allen v. Iranon, 283 F.3d 1070, 1076 (9th Cir.2002) (discussing internal affairs investigations as among "adverse employment actions" that could ground § 1983 liability); Rakovich v. Wade, 819 F.2d 1393, 1397 (7th Cir.1987) (holding that investigation undertaken in retaliation for exercise of constitutionally protected rights is actionable under § 1983), vacated on issue of damages on reh'g, 850 F.2d 1180 (7th Cir.1988).
 
 
 [2]
 Though the "clearly established" inquiry is an objective one, it is worth noting that Hansen himself has written and published on the topic of equal protection. See Carl Milazzo & Ronald Hansen, Racial Relations in Police Operations: A Legal and Ethical Perspective (Published manuscript from the 1999 Conference Materials, International Association of Chiefs of Police) (http://aele.org/losrace99.html)